James H. Fosbinder #7070
IVEY FOSBINDER FOSBINDER LLLC
A LIMITED LIABILITY LAW COMPANY
1883 Mill Street
Wailuku, Hawaii  96793
Telephone:  (808)242-4956
Facsimile:  (808)249-0668
Email:  jfosbinder@iff-law.com

Attorneys for Plaintiff
CHESTER A.K. DILLEY

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAR 1 4 2011

at 4 o'clock and 3 0 min. PM
SUE BEITIA, CLERK

## UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| CHESTER A.K. DILLEY, INDIVIDUALLY AND AS TRUSTEE OF THE CHESTER DILLEY SR. REVOCABLE TRUST DATED OCTOBER 14, 1993, <br><br> Plaintiff, <br><br> v. <br><br> COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE FINANCIAL CORPORATION; BANK OF AMERICA, N.A.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2006-23CB, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-23CB; Does 1-50. <br><br> Defendants. | Civil No. CV11-00168 DAE BMK <br><br><br> COMPLAINT; EXHIBITS "1" – "4"; DEMAND FOR JURY TRIAL; ~~SUMMONS~~ |

1

## COMPLAINT

Plaintiff CHESTER A.K. DILLEY, INDIVIDUALLY AND AS TRUSTEE OF THE CHESTER DILLEY SR. REVOCABLE TRUST DATED OCTOBER 14, 1993, (hereinafter "Plaintiff"), by and through his attorney, JAMES H. FOSBINDER, of IVEY, FOSBINDER, FOSBINDER LLLC, a Limited Liability Law Company, bring the following Complaint and allege and aver as follows:

## JURISDICTION AND VENUE

1.    Jurisdiction arises under 28 U.S.C. § 1331 (Federal Question Jurisdiction); the Sherman Anti-Trust Act, 15 U.S.C. § 1 et seq.; the Clayton Anti-Trust Act, 15 U.S.C. § 15 et seq.

2.    Jurisdiction also arises under 28 U.S.C. § 1332 (Diversity Jurisdiction).

3.    This Court has supplemental jurisdiction over this action under 28 U.S.C. § 1367(a) because state law claims are so related to the federal claims that they form part of the same case or controversy. These claims all arise out of the same controversy and sequence of events. This Court has jurisdiction over state claims asserted under Hawaii Revised Statutes (hereinafter "HRS") by virtue of pendent jurisdiction.

4.    Venue is proper in the United States District Court for the District of Hawaii, pursuant to 28 U.S.C. § 1391, in that Defendants systematically conduct and transact substantial

business in this State and District as licensed banks and corporations organized and/or operating in the State of Hawaii, the causes of action occurred in this District, and Plaintiff resides in this District.

## PARTIES

5.   Plaintiff CHESTER A.K. DILLEY is, and at all relevant times was, over the age of eighteen and resides at 30 PAHAA PLACE, MAKAWAO, HAWAII 96768, in the County of Maui, State of Hawaii (TMK (2) 3-030-046)(the "Subject Property").

6.   Defendant COUNTRYWIDE FINANCIAL CORPORATION ("Countrywide Financial") was, at all relevant times, a Delaware Corporation with its principal executive offices located at 4500 Park Granada, Calabasas, California.  COUNTRYWIDE FINANCIAL was a holding company which, through its subsidiaries, engaged in mortgage lending, mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting throughout the United States.  As discussed below, Countrywide Financial merged with and became a wholly owned subsidiary of Bank of America in 2008.

7.   Defendant COUNTRYWIDE HOME LOANS, INC. ("Countrywide Home"), a direct wholly owned subsidiary of Countrywide Financial, is a New York corporation with its principal place of business at 4500 Park Granada, Calabasas, California 91302.

Countrywide Home originates and services residential home mortgage loans. Countrywide Home served as the original lender of Plaintiff's home mortgage loan and as the "Seller" of the mortgages, including Plaintiff's, securing the trust. Countrywide Home was acquired by Bank of America on July 1, 2008, and now does business as BANK OF AMERICA HOME LOANS, A DIVISION OF BANK OF AMERICA.

8. Defendant BANK OF AMERICA, N.A. ("Bank of America") is a successor to Defendant Countrywide. On July 1, 2008, Countrywide Financial completed a merger with Red Oak Merger Corporation ("Red Oak"), a wholly owned subsidiary of Bank of America that was created for the sole purpose of facilitating the acquisition of Countrywide, pursuant to an Agreement and Plan of Merger, dated as of January 11, 2008, by and among Bank of America, Red Oak, and Countrywide Financial.

9. Bank of America assumed Countrywide's liabilities, having paid to resolve other litigation arising from misconduct allegedly committed by Countrywide. At the time of Bank of America's purchase of Countrywide, a Bank of America spokesperson publicly stated: "We bought the company and all of its assets and liabilities… . We are aware of the claims and potential claims against the company and have factored there into the purchase." Bank of America is a successor-in-interest

to the Countrywide Defendants and is thus vicariously liable for the conduct of the Countrywide Defendants alleged herein.[1]

10.    Defendant   Mortgage   Electronic   Registration   Systems, Inc. ("MERS") is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware, with its corporate headquarters in Reston, Virginia, and is a wholly owned subsidiary of MERSCORP, Inc. ("MERSCORP").    MERS operates   an   electronic   registry   designed   to   track   servicing rights and ownership of mortgage loans in all fifty states in the   United   States.   On   information   and   belief,   MERS   has   no authority to conduct business in Hawaii. Its registration with the   Hawaii   Department   of   Commerce   and   Consumer   Affairs   expired January 3, 2010, and has not been renewed to date.

11.    Defendant BANK OF NEW YORK MELLON ("BANK OF NEW YORK MELLON") FKA BANK OF NEW YORK, is, and at all relevant times was,   a   nationally   chartered   bank   with   its   principal   executive offices located in the State of Ohio.    BANK OF NEW YORK MELLON provides   a   range   of   financial   services   including,   *inter alia*, lending   and   depository   services,   cash   management,   foreign

---

[1] In a securities fraud action brought by the United States Securities and Exchange Commission ("SEC") against three former senior executives of Countrywide Financial, the federal court noted that "Countrywide's remaining operations and employees have been transferred to Bank of America, and Bank of America ceased using its Countrywide name in April 2009." *Securities and Exchange Commission v. Mozilo*, No. 09-CV-3994, 2010 WL 3656068, at *2 n.2 (C.D. Cal. Sept. 16, 2010).

exchange   and   trust   and   investment   management   services.
Defendant BANK OF NEW YORK MELLON is the Trustee for
Certificateholders CWALT, Inc., Alternative Loan Trust 2006-
23CB, Morgage Pass-Through Certificates, Series 2006-23CB (the
"Trust"), pursuant to a Pooling and Servicing Agreement ("PSA"),
dated as of June 1, 2006, with a Trust Closing Date of June 28,
2006. Relevant portions of the PSA are attached hereto
collectively as *Exhibit 1*, and the documents filed with the
Securities and Exchange Commission are public and may be viewed
online.[2]  Pursuant to the PSA, Alternative Loan Trust 2006-23CB
is a common law trust formed under the laws of the State of New
York. Its "Depositor" is CWALT, Inc., a Delaware corporation, a
limited-purpose finance subsidiary of Countrywide Financial
Corporation, 4500 Park Granada, Calabasas, California 91302.
CWALT served as "Depositor" and was an "Issuer" of the
Certificates within the meaning of the Securities Act, 15 U.S.C.
§ 77b(a)(4) and 17 CFR § 230.191.

12. Defendants JOHN AND MARY DOES 1-50, inclusive, are
individuals, partnerships, corporations, associations or any
other entity claiming any legal or equitable right, title,
estate, lien, or other interest in the Subject Property.

---

[2]  Pooling and Servicing Agreement dated as June 1, 2006,
ALTERNATIVE LOAN TRUST 2006-23CB MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2006-23CB, at
http://www.sec.gov/Archives/edgar/data/1366953/00009051480600484
1/efc6-1952_5904558ex991.txt

Plaintiff reserves the right to amend this Complaint to add any such party as described in this paragraph as such party's identity is ascertained through discovery or otherwise.

## ECONOMIC BACKGROUND TO THIS COMPLAINT[3]

**Traditional Role of Banks**

13. The role of banks has changed dramatically in the last two decades. Since the 1930s, residential mortgages were conventional products: long-term, fixed-rate, "prime" mortgages, meaning the underwriting criteria were strictly followed. The borrower was credit-worthy, he or she had the income to repay the debt, and the value of the real property sufficiently protected the lender in case of default. Banks had a vested interest in ensuring that the loans they made were sound products and that borrowers can and would repay the loans because banks either held on to the loans they made or sold them on the secondary market to Fannie Mae and Freddie Mac, which were sponsored by the federal government to provide liquidity in the housing market. These entities had strict "conforming" standards for the loans they were allowed to buy.

14. In 1993, there were only 24,000 subprime mortgages (where the borrower does not meet standard underwriting

---

[3] The economic processes that have given rise to this Complaint involve complex financial schemes and esoteric terminology. For this reason, Plaintiff respectfully requests that this Court allow general background information in order to clarify the economic reality of these financial arrangements.

criteria) used to purchase homes, with 80,000 subprime refinance loans. Prime purchase mortgages numbered 2.2 million, and 5.2 million prime refinance loans. In other words, there were 70 prime loans for every subprime loan.[4]

## Securitization and Mortgage-backed Assets

15.   In 1968, Ginnie Mae began securitizing mortgages, that is, buying mortgages from lenders, combining them into pools, and issuing securities backed by these mortgage pools. These "mortgage-backed securities" (MBS) each had a claim to a small piece of each mortgage. The risk of default of one loan was spread over the large numbers of investors. The U.S. government, through Ginnie Mae, guaranteed the principal on the mortgages.

16.   The Secondary Mortgage Market Enhancement Act of 1984 laid the way for present-day securitization by sidelining the tax and state regulations that previously prevented banks and other entities from doing so. Investment banks could now buy mortgages, pool them, and divide them into "tranches" (divisions of risk) and sell them to investors. Banks could now make money

---

[4] Simon Johnson and James Kwak, "13 Bankers: The Wall Street Takeover and the Next Financial Meltdown" (2010), at p. 127, citing HDMA data gathered by the Federal Financial Institutions Examination Council, matched with the HUD list of subprime lenders; cited in Kenneth Temkin, "Subprime Lending: Current Trends and Policy Issues," The Neighbor_Wors Journal, Spring-Summer 2000, available at http://knowledgeplex.org/kp/text_document_summary/article/relfil es/partner_content/nrc/ht_nrc_temkin.pdf.

multiple ways: originating mortgages, creating securitizations, earning fees selling MBS to investors, and trading securities. Securitization meant that loans could be resold on Wall Street, and mortgage origination became fee and volume driven.

17. Mortgage securitization involves the conversion of illiquid whole loans into bond-like instruments that trade in capital markets. Mortgage loan "pass-through" securities entitle the investor to payments from pools of mortgage loans, i.e., when borrowers make payments on the underlying mortgages, the cash flow is pooled and "passed through" to the investors.

18. Mortgage-backed securities (MBS) are typically created by the originating lenders selling the mortgage loans to a "special purpose vehicle" ("SPV"). SPVs are typically US-style trusts established specifically to facilitate the securitization. The SPV may hold the mortgage on its balance sheet or place it in a separate trust.

19. To transfer the pool of loans to a trust, the originating lender (called a "Seller" in MBS parlance) sells the loans to a Depositor, who then transfers – or "deposits" the acquired pool of loans to an "issuing trust."

20. Whether held by the SPV or sold into a trust, the rights to the cash flow are sold as bonds to investors, and the originating lender is paid off.

21.   Mortgage securitization directly led to the "originate to distribute" model of mortgage lending, with originating lenders increasingly more concerned with generating loans to sell the mortgages for securitization than they were with selling borrowers loans they could actually afford. Originating lenders did not have to wait 30 years to be repaid; they were repaid almost before (and in some cases well before) the ink was dry on the contracts. The risk of default was effectively passed to the investors, who may or not have known the risks they were exposed to. Underwriting criteria – whether a borrower was qualified for a loan – simply ceased to matter. The problem is that no one bothered to warn the borrowers.

22.   Waves of "innovation" in subprime lending lured borrowers into subprime (also now called "toxic") mortgages, which in turn fed the lucrative securitization machine. "Alt-A" loans were the moniker given to higher-end subprime mortgages. Other products promised the American Dream: adjustable-rate mortgages ("ARMS") with fabulous low-interest "teaser" initial rates and "pay option" mortgages where borrowers could choose to pay less than the monthly interest on their loan, so the principal would go up, not down. Lenders made money originating loans; then, when the interest rates reset and borrowers couldn't afford the payments, they made money on re-financing.

**Consolidation and Growth of Top-Tier Financial Institutions**

23.   With the mortgage industry booming, large banks began acquiring subprime lenders. Among the top 25 subprime lenders, First Franklin was bought by National City and alter by Merrill Lynch; Long Beach Mortgage was bought by Washington Mutual; Household Finance was bought by HSBC; BNC Mortgage was bought by Lehman Brothers; Advanta was bought by JPMorgan Chase; Associates First Capital was bought by Citigroup; Encore Credit was bought by Bear Stearns; and American General Finance was bought by AIG.[5] Not only did the big banks want the fees generated by subprime mortgages, these mortgages would feed the banks' own securitization business.

24.   The wave of mergers consolidated economic and political power in a handful of megabanks, among them Citigroup, Bank of America, J.P. Morgan, Chase, First Union, and Wells Fargo. The passage of the Gramm-Leach-Bliley Act in 1999 meant that investment banking – including buying, selling, trading mortgage-backed securities – was now given a government bail-out guarantee previously only given to traditional banks.

---

[5] Simon Johnson, "13 Bankers," Id. at page 128, citing Alyssa Katz, Our Lot: How Real Estate Came to Own Us (New York: Bloomsbury, 2009), 70; Center for Public Integrity, Who's Behind the Financial Meltdown? The Top 25 Subprime Lenders and Their Wall Street Backers, available at http://www.publicintegrity.org/investigations/economic_meltdown/ the_subprime_25/.

25.   The term "too big to fail" ("TBTF") refers to certain financial institutions that are so large and interconnected that they cannot be allowed to go into uncontrolled bankruptcy; defaulting on their obligations will create significant losses for other financial institutions, potentially triggering a domino effect that causes the entire financial system to collapse.[6]

26.   What makes a financial institution too big to fail is the amount of collateral damage that its uncontrolled failure could cause.   This damage can take several different forms.   A failing institution could have thousands of open transactions with counterparties, which are largely other financial institutions.[7]  A failing bank may have sold credit default swap ("CDS") protection on various securities; its counterparties are assuming that they are perfectly hedged because of those swaps. However, when the bank fails, suddenly those hedges disappear

---

[6] For example, the bankruptcy of Lehman Brothers ("Lehman") in September 2008 accelerated the collapse of American International Group ("AIG"), forcing it to rely on funds from the Federal Reserve.   Lehman's failure also caused a sudden loss of confidence in all money market funds; in turn, the flood of money out of the money market funds cause the commercial paper market to freeze, thus endangering the ability of many corporations to operate on a day-to-day basis.   The sequence of failures was only stopped by massive government rescue measures.
[7]   For example, at the time of its collapse, the face value of AIG's open derivatives contracts was $2.7 trillion – $1 trillion of it was held by only twelve financial institutions.

and the counterparties are forced to take large losses on the underlying securities.

27.  Beyond the collateral damage that large interconnected financial institutions inflict on the financial system, TBTF institutions create significant problems for society as a whole.

28.  First, when TBTF institutions come to the brink of failure, they have to be bailed out, usually by the government (and taxpayers).  A TBTF bank cannot be allowed to go into ordinary bankruptcy procedure because its creditors and counterparties would be cut off from their money supply for months, which could be fatal.  This means that government must keep failing banks afloat and, without a credit threat of bankruptcy to negotiate with, must honor all of the bank's obligations; in other words, the money the bank lost has to be made up with public funds.  This "hidden subsidy" has been calculated to be worth approximately $34 billion for 18 large banks in 2009, accounting for roughly half of their profits.[8]

29.  All banks are highly leveraged, which means that they are betting with other people's money.   There are many strategies – of which, securitization is the most popular – that

---

[8] Simon Johnson and James Kwak, 13 Bankers, at p. 205, citing Dean Baker and Travis McArthur, "The Value of the 'Too Big to Fail' Big Bank Subsidy," Center for Economic and Policy Research Issue Brief, September 2009, available at http://www.cepr.net/documents/publications/too-big-to-fail-2009-09.pdf.

increase returns for shareholders (and executives) while shifting potential losses onto someone else. TBTF institutions have a strong incentive to take excessive risk, since the government effectively guarantees their losses in an emergency. This sets up a situation where the market's checks and balances do not operate to curb excessive risk taking. Because creditors are aware that the government will not let these banks fail by guaranteeing their losses, they continue to invest.

30. Arguably most significant problem for society is that TBTF banks stifle competition and therefore are bad for the economy. Because large "megabanks" have an implicit government guarantee, bond investors are willing to lend them money at lower interest rates than offered to their smaller competitors. This subsidy makes it harder for smaller banks to compete, deterring new entrants and only strengthening the long-term process of consolidation and concentration in the financial sector. To wit, large banks paid .78 percentage points less for money than smaller banks in the wake of the financial crisis[9], resulting in a huge competitive advantage and consolidating their stranglehold on the economy.

31. By 2008, the big banks became bigger. Bank of America bought Countrywide. Merrill Lynch's assets grew from $1.7 trillion to $2.3 trillion – from 2007 to 2009. JPMorgan Chase

---

[9] Simon Johnson, 13 Bankers, Id. at 205.

absorbed Bear Stearns and Washington Mutual grew from $1.6 to $2 trillion. JPMorgan Chase, Bank of America, and Wells Fargo had to be exempted from a federal rule prohibiting a single bank from holding more than 10% of all deposits in the U.S. They were also exempted from Dept. of Justice antitrust guidelines intended to limit monopoly power in specific metropolitan regions. By 2009, these three banks controlled half the market for new mortgages.[10]

32.  At present, there are at least six banks that are considered too big to fail – Bank of America, Citigroup, Goldman Sachs, JPMorgan Chase, Morgan Stanley, and Wells Fargo.  Of these six megabanks, four – Bank of America, Wells Fargo, Citigroup and JPMorgan Chase – maintain over 63% of the market share for mortgage originations.

**The Role of MERS**

33.  MERS controls the operation of the mortgage industry and such control has harmed the borrowers, including the Plaintiff herein. On its homepage, it touts: "MERS is an innovative process that simplifies the way mortgage ownership and servicing rights are originated, sold and tracked. Created by the real estate finance industry, MERS eliminates

---

[10] Simon Johnson, 13 Bankers. Id., at 180.

the need to prepare and record assignments when trading residential and commercial mortgage loans."[11]

34.   MERS Membership Rules and By-Laws govern its members' loan servicing and foreclosure practices. Members agree to be "bound" by the provisions of the Rules and Bylaws, including MERS' rules governing foreclosure practices.[12]

35.   MERS also intentionally withheld the identity of "investors" (the purported holders of the promissory notes secured by the mortgages). Because of the recent political and legal pressure, MERS recently sent out a press release announcing that it would reveal the investor's name and contact information, but only if the investor(s) agreed to the disclosure. Because it was a MERS' policy, all members had to comply.

36.   The MERS monopoly has resulted in the creation of a previously unimaginable industry: one established to create false documents. One such firm has made national news by offering a menu of services, which has been reported by the national media to include "creating - that is, conjuring from thin air - various documents that the trust owning the loan should already have on hand." The firm offers creation of a

---

[11] "Welcome to MERS!" http://mersinc.com.
[12] Merscorp, Inc., "Rules of Membership," http://www.mersinc.org/Foreclosures/index.aspx; also see, MERS' "Legal Primer" regarding foreclosure.

"collateral file," i.e., all the documents needed to establish ownership of a real estate loan. "Equipped with a collateral file, you could likely persuade a court that you were entitled to foreclose on a house even if you had never owned the loan."[13]

37.   Attorneys general from all 50 states are investigating the poor record keeping by MERS, banks, and the servicers (companies that collect mortgage payments). The Federal Reserve is investigating whether mortgage companies have cut corners in the foreclosure process, using "robo-signers" to sign thousands of mortgage assignments and foreclosure documents without having made the legal investigation required to execute such documents.

38.   Many anti-trust claims involve esoteric mathematical analysis of claimed price manipulation by companies controlling as little as 10 percent of an industry in relatively small area. Complex math is not necessary in this case.

39.   Under any test, MERS and its shareholders control the mortgage industry, the foreclosure assistance industry, and the digital identification of real property. As to its own members claiming that MERS is a monopoly, Ocwen Loan Servicing LLC sued MERS, claiming, "Without access to MERS, Ocwen cannot compete because it will be denied access to a business element necessary

---

[13] Yves Smith, *How the Banks Put the Economy Underwater*, New York Times (October 30, 2010), http://www.nytimes.com/2010/10/31/opinion/31smith.html?_r=1&sq=mortgage securitization&st=cse&scp=1&pagewanted=all (last accessed 11/8/2010).

for effective competition." See, *Ocwen Loan Servicing LLC v.*
*Mortgage Electronic Registration Systems, Inc.,* Civ. 1:08cv824,
(U.S. Dist. Ct., E.D. Va., filed August 8, 2008).

40. As a result of the actions of MERS and its
shareholders, the real property markets were destabilized, banks
made income on fees for both betting on and betting against
homeowners, and millions of families will lose their homes to
foreclosure. MERS and its shareholders were well aware that they
had created a Ponzi scheme – but like all "successful" such
schemes, if you get in and out early, they make fine
investments.

41. What justice demands today is that the borrowers --
and the investors -- in the mortgages have an opportunity to
work through this mess of the securitization of mortgages and
come to a resolution that is best for both parties, and, the
public at large. Plaintiffs request the opportunity to work with
the actual investors of the mortgages, which would be a question
of fact that can only be resolved by an evidentiary hearing into
who is the actual Note Holder, how much is owed and to whom, and
whether any third-party payments have been made on Plaintiffs'
behalf, by insurance or otherwise.

## FACTS COMMON TO ALL CLAIMS

42. On April 13, 2006, Plaintiff executed a promissory
note (the "Promissory Note" or "Note") agreeing to pay

$420,000.00 to Countrywide Home as "Lender".   On the same day, Plaintiff entered into a mortgage (the "Mortgage") granting a security interest in the Subject Property to Countrywide Home Loans, Inc.   The Mortgage document was recorded by or on behalf of MERS in the State of Hawaii Bureau of Conveyances on April 24, 2006, as Document No. 2006-075636, and is attached hereto as Exhibit 2.

43.   On July 30, 2009, an Assignment of Mortgage was executed by KEVIN A. DURHAM, purportedly in his capacity as Assistant Vice-President of MERS "solely as nominee" for Countrywide Homes in which it purports to transfer to BANK OF NEW YORK MELLON, as trustee for the Trust, "… all mortgage interest under that certain Mortgage dated 4/13/2006 executed by Chester A.K. Dilley, Married, as Trustee of the Chester Dilley Sr. Revocable Trust Dated October 14, 1993, mortgagor, in favor of Mortgage Electronic Registration Systems, Inc., as nominee for Countrywide Home Loans, Inc., as mortgagee recorded as Document No. 2006-075636 on 4/24/2006 in the Bureau of Conveyances of the State of Hawaii …. Together with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Mortgage." The Assignment of Mortgage was recorded in the Bureau of Conveyances on August 27, 2010, as Document No. 2009-131920, and is attached hereto as Exhibit 3.

44.   Simultaneously   on   August   27,   2010,   a   Notice   of
Mortgagee's Intention to Foreclose Under Power of Sale ("Notice
of Foreclosure") was issued by BANK OF NEW YORK MELLON as
"Mortgagee", and was recorded in the Bureau of Conveyances as
Document No. 2009-131921. Exhibit 4.

45.   Plaintiff submits that BANK OF NEW YORK MELLON does
not have the legal authority to foreclose on Plaintiff's
property for at least the following reasons:

(a)   The documents demonstrate that there are or may be
multiple parties expressing conflicting interests in the
Promissory Note, Mortgage, and the Subject Property.

(b)   MERS has no financial interest in the Promissory
Note or Mortgage. Its only function is to keep the security in
its name to save those benefiting from the buying and selling of
mortgages and mortgage-backed securities any recording fees and
to keep the identity of the note holders hidden.

(c)   MERS did not have the legal authority to assign the
mortgage or note to BANK OF NEW YORK MELLON because MERS was, at
all times, acting "solely as a nominee" for Countrywide Home.
Therefore, BANK OF NEW YORK MELLON is not a valid assignee of
the Mortgage and therefore has no legal right to enforce the
Mortgage.

(d)   The location of the Promissory Note is unknown. The
original Note is believed to never have been delivered to

subsequent purchasers, but rather may have remained in the possession of Countrywide Homes thereby clouding any title claims that may arise in respect of the Note.

(e)   Even if this court finds that MERS has the legal authority to assign a mortgage as nominee for Countrywide Home, Plaintiff submits that the Mortgage was not assigned to BANK OF NEW YORK MELLON prior to the "Cut-Off Date" of the Trust, which was June 28, 2006, in breach of Section 2.01 of the PSA governing the Trust.   As such, the Mortgage was never validly deposited into the Trust and never formed part of the assets of the Trust.

(f)   If any of the Defendants or purported Note Holders are allowed to enforce the Note and Mortgage without producing the original with all indorsements and allonges showing that particular Defendant's authority to enforce the Note along with proof of entitlement to payment (i.e., proof that the entity has not already been paid), Plaintiff is in jeopardy of other individuals or entities appearing at a later date and claiming legitimate and legal entitlement to payment under the Note. This would result in double, or even exponential, liability for the Note.

## FACTS COMMON TO PLAINTIFF'S CLAIMS FOR SLANDER OF TITLE, QUIET TITLE, AND INJUNCTIVE RELIEF

**MERS did not have legal authority to assign the Mortgage and, therefore, BANK OF NEW YORK MELLON is not a valid assignee entitled to enforce the Mortgage.**

46.   With reference to MERS's role in Plaintiff's mortgage loan transaction, the Mortgage states:

> MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.   MERS is the mortgagee under this Security Agreement (Mortgage, Exhibit 2, P. 2).

47.   The Mortgage also purports to contain a transfer to MERS of Plaintiff's rights in the Subject Property as follows:

> This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.   For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the [Subject Property].

> Borrower understands and agrees that **MERS holds only legal title to the interests granted by Borrower in this Security Instrument**, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument. (Exhibit 2, PP. 3-4) (emphasis added).

48.   The Assignment of Mortgage, dated July 30, 2009, and recorded August 27, 2009, as Document No. 2009-131920 in the State of Hawaii Bureau of Conveyances, references the Mortgage and states:

> FOR VALUE RECEIVED, Mortgage Electronic Registration Systems, Inc. as nominee for Countrywide Home Loans, Inc., … hereby grants, assigns, and transfers to The Bank Of New York, as Trustee for the Certificateholders CWALT, Inc., Alternative Loan Trust 2006-23CB, Mortgage Pass-Through Certificates, Series 2006-23CB … all mortgage interest under that certain Mortgage dated 4/13/2006 executed by Chester A.K. Dilley, Married, as Trustee of the Chester Dilley Sr. Revocable Trust Dated October 14, 1993, mortgagor, in favor of Mortgage Electronic Registration Systems, Inc., as nominee for Countrywide Home Loans, Inc., as mortgagee recorded as Document No. 2006-075636 on 4/24/2006 in the Bureau of Conveyances of the State of Hawaii ….
>
> **Together with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Mortgage.** (Exhibit 3. Emphasis added.)

49.   Plaintiff argues that MERS's "nominee" status and the rights bestowed upon MERS within the Mortgage itself, are insufficient to empower MERS to effectuate a valid assignment of mortgage or promissory note.

50.   In a 2006 published opinion, the New York Court of Appeals described the MERS system as follows:

> In 1993, the MERS system was created by several large participants in the real

estate mortgage industry to track ownership interests in residential mortgages. Mortgage lenders and other entities, known as MERS members, subscribe to the MERS system and pay annual fees for the electronic processing and tracking of ownership and transfers of mortgages. Members contractually agree to appoint MERS to act as their common agent on all mortgages they register in the MERS system.

The initial MERS mortgage is recorded in the County Clerk's office with 'Mortgage Electronic Registration System, Inc.' named as the lender's nominee or mortgagee of record on the instrument. During the lifetime of the mortgage, the beneficial ownership interest or servicing rights may be transferred among MERS members (MERS assignments), but these assignments are not publicly recorded; instead they are tracked electronically in MERS's private system. In the MERS system, the mortgagor is notified of transfers of servicing rights pursuant to the Truth in Lending Act, but not necessarily of assignments of the beneficial interest in the mortgage.

*Merscorp, Inc., v. Romaine*, 8 N.Y.3d 90 (N.Y. 2006) (footnotes omitted).

51. There is little to no case law in the State of Hawaii that interprets the role and legal status of MERS. Recently however, a New York Bankruptcy Court set forth a detailed analysis of the role of MERS because "MERS's role in the ownership and transfer of real property notes and mortgages is at issue in dozens of cases" (*In re Ferrel L. Agard*, Bkrtcy. No. 810-77338-reg (D.N.Y.) at *19). The Court stated that:

Other than naming MERS as "nominee", the Mortgage also provides that the Borrower

transfers legal title to the subject property to MERS, as the Lender's nominee, and acknowledges MERS's rights to exercise certain of the lender's right under state law.  This too, is insufficient to bestow any authority upon MERS to assign the mortgage.  In Bank of New York v. Alderazi, the court found "[t]he fact that the borrower acknowledged and consented to MERS acting as nominee of the lender has no bearing on what specific powers and authority the lender granted MERS." Alderazi, 900 N.Y.S.2d at 824.  Even if it did bestow some authority upon MERS, the court in Alderazi found that the mortgage did not convey the specific right to assign the mortgage.

52.  The court concluded that naming MERS a "nominee" did not bestow authority upon MERS to assign the mortgage. (Agard, at 31).

53.  In *LaSalle Bank, N.A. v. Bouloute*, No. 41583/07, 2010 WL 3559552, at *2 (N.Y. Sup. Aug. 26, 2010), the court analyzed the relationship between MERS and the original lender and concluded that a nominee possesses few or no legally enforceable rights beyond those of a principal whom the nominee serves.  The court further concluded that MERS must have some evidence of authority to assign the mortgage in order for the assignment of a mortgage by MERS to be effective.  Evidence of MERS's authority to assign could be by way of a power of attorney or some document executed by the original lender (*See Bouloute, 2010 WL 3559552, at *1*).

54. In Agard, MERS argued that it had authority to act as "agent" for each and every MERS member claiming ownership of a note and mortgage registered in its system. This authority is purportedly based on the terms and conditions of a MERS membership agreement. Those terms and conditions provide that "MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time." (Agard, at 26).

55. Under Hawaii agency laws, an agency relationship arises when "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Restatement (Third) of Agency § 1.01.* Further, "[i]t is well established that '[a]n agency relationship may be created through actual or apparent authority.'" (*State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc.*, 90 Haw. 315, 325, 978 P.2d 753 (1999) (quoting *Cho Mark Oriental Food, Ltd. V. K & K Int'l*, 73 Haw. 509, 515-16, 836 P.2d 1057, 1061-62 (1992)).

56. Actual authority exists "only if there has been a manifestation by the principal to the agent that the agent may act on his account and consent by the agent so to act, and may be created by express agreement or implied from the conduct of

the parties or surrounding circumstances." *State Farm*, 90 Haw. At 325, 978 P.2d at 763 (quoting from *Cho Mark*, 73 Haw. At 515-16, 836 P.2d at 1061-62). Express actual authority "requires an oral or written agreement between the parties that the principal has delegated authority that the agent has accepted and that authorizes the agent to do certain things." *Cho Mark*, 73 Haw. At 515-16, 836 P.2d at 1061-62.

57. Because MERS's members, the beneficial noteholders, purported to bestow upon MERS interest in real property sufficient to authorize the assignments of mortgage, **the alleged agency relationship must be committed to writing by application of the statute of frauds**. The Hawaii Statute of Frauds states in relevant part that no action may be brought or maintained upon any contract for the sale of lands, tenements, or hereditaments, or of any interest in or concerning them unless the promise, contract, or agreement, upon which the action is brought, or some memorandum or note thereof, is in writing, and is signed by the party to be charged therewith, or by some person thereunto by the party in writing lawfully authorized. HRS § 656-1.

58. Plaintiff submits that neither the Mortgage, nor any other document which has been provided to Plaintiff, evidences an agency relationship between MERS and Countrywide. In the absence of such express authorization, Plaintiff submits that the assignment of his Mortgage and Note by MERS to BANK OF NEW

YORK was not a valid assignment because MERS did not have the legal authority as mere "nominee" of Countrywide to make such an assignment.   As a consequence, Plaintiff further submits that BANK OF NEW YORK MELLON is not a valid assignee of his Mortgage and therefore does not have the legal authority to pursue foreclosure against the Subject Property.

**Countrywide Did Not Effectively Transfer Plaintiff's Original Note Thereby Ensuring a Clear Chain in Title to Plaintiff's Mortgage**

59.  An essential aspect of the mortgage securitization process is that the issuing trust for each MBS offering must obtain good title to the mortgage loans comprising the pool for that offering.   This is necessary in order for the MBS holders to be legally entitled to enforce the mortgage loans in case of default.   Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process – a promissory note and a security instrument (either a mortgage or deed of trust).   The rules that govern these transfers are contained in Hawaii's Uniform Commercial Code ("UCC") and the terms of the PSA (*Exhibit 1*).

60.  The right to enforce a promissory note can be transferred only by physical delivery of the original note. Under section 3-301 of the "UCC", a "person entitled to enforce" an instrument means (with certain exceptions not relevant in

this case) either "the holder of the instrument" or "a nonholder in possession of the instrument who has the rights of a holder." Thus, section 3-301 ties the enforcement right to possession of the paper. Section 3-302(a) of the UCC provides that "an instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." Under these sections, no one can enforce (and hence, no one can foreclose a mortgage secured by) a negotiable note unless the note has been delivered to that person.

61. Section 2.01(c) of the PSA requires the Depositor to have delivered or cause to be delivered to the Trustee for the benefit of the Certificateholders, the documents and instruments with respect to each mortgage loan as assigned, including:

> (i) (A) the original Mortgage Note endorsed by manual or facsimile signature in blank in the following form: "Pay to the order of _____ without recourse," with all intervening endorsements showing a complete chain of endorsement from the originator to the Person endorsing the Mortgage Note (each such endorsement being sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note); or

> (B) with respect to any Lost Mortgage Note, a lost note affidavit from Countrywide stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note.

62. Pursuant to the UCC (H.R.S. §§ 490:3-204) and Section 2.01(b) of the PSA, the promissory note and security instrument

(mortgage) must be transferred by indorsement (in the same way that a check may be transferred by indorsement) or by sale. Further, the UCC requires that the trustee have physical possession of the original, manually signed note in order for the loan to be enforceable by the trustee against the borrower in case of default (H.R.S. §§ 490:3-201-203).

63. Hawaii trust law generally requires strict compliance with trust documents, including the PSA. Failure to comply strictly with the timeliness, indorsement, physical delivery or other requirements of the PSA with respect to the transfer of the note and security instrument means that the transfer is void and the Trust does not have good title to Plaintiff's Mortgage.

64. The Countrywide Defendants, however, routinely failed to comply with the requirements of the UCC and the PSA for valid transfer of Plaintiff's (and others) Note and Mortgage to the Trust. In *Kemp v. Countrywide Home Loans, Inc.*, Bkrtcy. No. 08-18700 (D.N.J.), Countrywide Financial sought to prove that the Bank of New York, was trustee for a residential MBS issuing trust that purportedly held Mr. Kemp's mortgage, was entitled to enforce the mortgage. Countrywide Financial presented testimony by Linda DeMartini, who had been employed by Countrywide Home Loans Servicing LP ("Countrywide Servicing") for approximately 10 years as of August 2009 and was then a supervisor and operational team leader for the Litigation Management Department

of Countrywide Servicing. Ms. DeMartini testified that, Countrywide Home originated Kemp's loan in 2006 and transferred it to the Bank of New York as trustee for the issuing trust, but that Countrywide Servicing retained the original note in its own possession and never delivered it to the Bank of New York because Countrywide Servicing was the servicer of the loan.

65. Even though DeMartini was presented by Countrywide Financial as a witness in an attempt to prove that the loan documents had been validly transferred to the issuing trust, his testimony, in fact, proved that the loan documents were never validly transferred. She testified that an allonge to the promissory note, which purported to transfer the note to the trust by indorsement, was prepared only in preparation for the litigation in 2009, long after the purported transfer of the note to the trust in 2006, and was never delivered to the trustee. Indeed, she testified that there was no ordinary business practice of signing an allonge at the time a note was purportedly transferred.

66. DeMartini also testified that the original note was retained by Countrywide and was never delivered to the trustee. Most significantly, she testified on direct examination that not delivering the original note to the trustee was Countrywide's standard business practice:

Q. Ms. DeMartini, is it generally the custom to – for your investor [i.e., the issuing trust] to hold the documents?

A. No. They would stay with us as the servicer.

Q. And are documents ever transferred to the investor?

A. If we service-release them they would be transferred to whomever we're service-releasing them to.

Q. So I believe you testified Countrywide was the originator of this loan?

A. Yes.

Q. So Countrywide had possession of the documents from the outset?

A. Yes.

Q. And subsequently did Countrywide transfer these documents by assignment or an allonge?

A. Yes.

Q. And –

A. Well, transferred the rights, yes, transferred the ownership, not the physical documents.

Q. So the physical documents were retained within the corporate entity Countrywide or Bank of America?

A. Correct.

Q. Okay. And would you say that this is standard operating procedure in the mortgage banking business?

A. Yes. It would be normal – the normal course of business as the reason that we are the servicer, as we're the ones that are

doing all the servicing, and that would
include retaining the documents.

67. At a subsequent hearing in September 2009,
Countrywide's counsel stated that:

> [A]lthough...the UCC and the Master Servicing
> Agreement apparently requires that,
> procedure seems to indicate that they don't
> physically move documents from place to
> place because of the fear of loss and the
> trouble involved and the people handling
> them. They basically execute the necessary
> documents and retain them as long as
> servicing's retained. The documents only
> leave when servicing is released.

68. Based on the evidence quoted above, Chief Bankruptcy
Judge Judith H. Wizmur held in November 2010 that the Bank of
New York, as trustee for the issuing trust, could not enforce
the mortgage loan for two reasons:

> First, under New Jersey's Uniform Commercial
> Code ("UCC") provisions, the fact that the
> owner of the note, the Bank of New York,
> never had possession of the note, is fatal
> to its enforcement. Second, upon the sale
> of the note and mortgage to the Bank of New
> York, the fact that the note was not
> properly indorsed to the new owner also
> defeats the enforceability of the note.
>
> *Kemp v. Countrywide Home Loans, Inc.*, No.
> 08-18700-JHW, Slip Op., at *10-11 (Bkrtcy.
> D.N.J. Nov. 16, 2010)

**Plaintiff's Mortgage was not deposited into the Trust
before cut-off date, which additionally invalidates the
Assignment of Mortgage from Countrywide to the Trust.**

69. Trust law generally requires strict compliance with
trust documents, including the PSA. Failure to comply strictly

with the time requirements of the PSA with respect to the transfer of the note and security instrument means that the transfer is void and the Trust does not have good title to Plaintiff's Mortgage.

70.   Section 2.01(a) and (c) of the PSA governing the Trust into which Plaintiff's Promissory Note was purportedly entered, represents and warrants that:

> (a) … On or prior to the Closing Date [i.e., June 28, 2006] Countrywide shall deliver to [CWALT, Inc. as the Depositor] or, at the Depositor's direction, to the Trustee or other designee of the Depositor, the Mortgage File [i.e., the mortgage documents listed in Section 2.01] for each Mortgage Loan listed in the Mortgage Loan Schedule … .

> (c) [CWALT, INC. as Depositor] has delivered or caused to be delivered to the Trustee … for the benefit of the Certificateholders, the documents and instruments with respect to each Mortgage Loan as assigned: (i)(A) the original Mortgage Note … or (B) with respect to any Lost Mortgage Note, a lost note affidavit from Countrywide stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note.

> [To clarify terminology as used within the PSA: The term "mortgage" means deed of trust or other instrument creating a first lien on an estate in fee simple or leasehold interest in real property securing a Mortgage Note.

> "Mortgage Note" is defined as follows: The original executed note or other evidence of indebtedness evidencing the indebtedness of a Mortgagor under a Mortgage Loan. It is also known as "promissory note," and is referred to by both names, as applicable, herein.] PSA, at Definitions.[14]

---

[14] Id., Footnote 2.

71.   The   PSA   at   Section   2.01   further   represents   and warrants in relation to the assignment of a MERS Mortgage Loan that:

> [COUNTRYWIDE, as Seller] agrees that it will cause, at
> the Trustee's expense, the MERS(R) System to indicate
> that the Mortgage Loans sold by such Seller to the
> Depositor have been assigned by that Seller to the
> Trustee in accordance with this Agreement for the
> benefit of the Certificateholders by including (or
> deleting, in the case of Mortgage Loans which are
> repurchased in accordance with this Agreement) in such
> computer files the information required by the MERS(R)
> System to identify the series of the Certificates
> issued in connection with such Mortgage Loans.

72.   In other words, on or before the Closing Date (June 28, 2006), the original mortgage note must have been delivered or caused to be delivered to the Trustee and COUNTRYWIDE must provide written confirmation to the Trustee evidencing the assignment of the Mortgage.

73.   Plaintiff   submits   that   neither   the   Note   nor   the Mortgage was entered into the Trust in accordance with the terms and conditions of the PSA.   Plaintiff further alleges that the original Note never left the possession of Countrywide.   It is the admitted practice of Countrywide to maintain possession of the original Notes.   There is no evidence that a lost note affidavit was entered into Trust by the Closing Date.   In the absence of evidence to the contrary, Plaintiff alleges that

neither the Note nor a valid lost note affidavit was deposited into the Trust prior to the Closing Date.

74. With respect to the assignment of Plaintiff's Mortgage, the evidence clearly indicates that the Mortgage was not assigned to the BANK OF NEW YORK until July 30, 2009; approximately **three years after the Closing Date of the Trust.** Plaintiff submits that such retroactive assignment of the Mortgage is not permitted under the terms of the PSA, which makes clear that evidence of assignment must be provided, in written form, **no later than 30 days after the Closing Date (June 28, 2006).** Exhibit 1 at 2.01(c).

75. The Defendants' failure to comply strictly with the time requirements of the PSA with respect to the transfer of the note and security instrument means that the Assignment of Mortgage is void and the Trust does not have good title to Plaintiff's Mortgage.

### LEGAL FRAMEWORK AND FACTS COMMON TO PLAINTIFF'S CLAIMS FOR VIOLATION OF FEDERAL AND HAWAII ANTI-TRUST STATUTES

76. The substantive provisions of the Sherman, Clayton, and Federal Trade Commission Acts were incorporated verbatim into Hawaii anti-trust law; therefore, interpretation of Hawaii's anti-trust statutes is "in accordance with judicial interpretations of similar federal antitrust statutes," and courts may address the federal and state claims together, rather

than separately. HRS § 480-3. See, e.g., *State v. Gannet Pac. Corp.*, 99 F.Supp.2d 1241, 1248 n.7 (D. Haw. 1999) ("[T]he Court need not address the sate law claims separately because they essentially mirror the federal claims" of "restraint of trade, conspiracy to monopolize, and attempted monopolization.") (citing *Robert's Haw. Sch. Bus, Inc., v. Laupahoehoe Transp. Co.*, 982 P.2d 853 (Haw. 1999), noting that the legislature followed the "federal paradigm" in fashioning Hawaii antitrust law.).

77. Any person injured in his business or property due to a violation of the Hawaii Anti-Trust Act may sue for damages under §480-13(a). Standing applies to consumers, and is not limited to alleging commercial or competitive injury. The essential elements of a private action under HRS 480-2 are: "(1) a violation of Chapter 480; (2) injury to the plaintiff's business or property resulting from such violation; (3) proof of the amount of damages; and (4) a showing that the action is in the public interest or that the defendant is a merchant." Ai v Frank Huff-Agency, 607 P.2d 1304, 1311 (Haw. 1980), overruled on other grounds by *Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co.*, Id.

78. As to the fourth element, Plaintiff submits that the named Defendants are both "merchants" and also that this claim is brought in the public interest.

"[T]o justify filing a complaint the public interest must be specific and substantial. Often it is so, because the unfair method employed threatens the existence of present or potential competition. **Sometimes, because the unfair method is being employed under circumstances which involve flagrant oppression of the weak by the strong.** Sometimes, because, although the aggregate of the loss entailed may be so serious and widespread as to make the mater one of public consequence, no private suit would be brought to stop the nfair conduct, since the loss to each of the individuals affected is too small to warrant it." *Ai*, Id. at 1310, quoting *FTC v. Klesner*, 280 U.S. 19, 28 (1929).

79.   Hawaii Courts have followed federal law when defining the terms "unfair" and "deceptive" in HRS §480-2.

"A practice is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Dubin v. Wakuzawa, 970 P.2d 496, 505 (Haw. 1999)(quoting Eastern Star, Inc. v. Union Bldg. Materials Corp., 712 P.2d 1148, 1154 (Haw. 1985) (quoting Rosa v. Johnson, 651 P.2d 1228, 1234 (Haw. Ct. App. 1982)); Spiegel, Inc., v. FTC, 540 F.2d 287, 293 (7th Cir. 1976)).

Deception is "an act causing as a natural and probable result, a peson to do that which he would not otherwise do." Dubin v. Wakuzawa, Id. at 505, (quoting Eastern Star, Inc., Id. (citing Bockenstette v. FTC, 134 F.2d 369 (10th Cir. 1943)). See also Hawaii Comty. Fed. Credit Union v. Keka, 11 P.3d 1, 16-17 (Haw. 2000).

80.   Deceptive acts or practices are distinct from unfair acts or practices, both in how they are defined and in the standard by which they are proved. *State v. United States Steel Corp*, 919 P.2d 294, 313 (Haw. 1996). Actual deception need not be show; the capacity to deceive is sufficient. Eastern Star,

Inc., 712 P.2d at 1154(citing Goodman v. FTC, 244 F.2d 584 (9th Cir. 1957)); see also Hawaii Comty. Fed. Credit Union, Id.; Dubin, Id., citing Eastern Star, Inc., Id.).

81. Monopolization is prohibited by HRS § 480-9, which is taken from the Sherman Act, 15 U.S.C. § 2. The Hawaii Supreme Court, in *Island Tobacco I,* stated: "The offence of monopoly under Section 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Island Tobacco Co. v. R.J. Reynolds Tobacco Co., 627 P.2d 260, 274 (Haw. 1981) (quoting U.S. v. Grinnell Corp., 384 U.S. 563, 570-571, overruled on other grounds by Robert's Haw.Sch.Bus, Inc., v. Laupahoehoe Transp. Co., Id.).

82. In *Island Tobacco II,* the federal court identified the elements of an "Attempt to monopolize" claim as involving "(1) a specific intent to control prices or destroy competition with respect to a part of commerce; (2) predatory conduct directed toward accomplishing the unlawful purpose; (3) a dangerous probability of success." Below-cost pricing may prove the specific intent and dangerous probability of success elements. Island Tobacco Co. V. R.J. Reynolds, 513 F.Supp. 726 (D. Haw. 1981).

CLAIM 1
## VIOLATION OF FEDERAL AND HAWAII ANTI-TRUST STATUTES
(Against Defendants COUNTRYWIDE FINANCIAL and COUNTRYWIDE HOME
LOANS, INC., BANK OF AMERICA, N.A., and MERS)

83.  Common  residential  lending  scenarios  involve  two
parties  to  a  real  property  mortgage  –  a  mortgagee,  i.e.,  a
lender,  and  a  mortgagor,  i.e.,  a  borrower.   In  effect  the  MERS
system  was  designed  to  circumvent  and,  as  envisioned  by  its
originators   replace,   the   traditional   system   of   public
recordation  of  mortgages.  Some  jurisdictions  have  enacted
statutes  authorizing  MERS's  authority  to  register  itself  as
"mortgagee or record," but Hawaii has enacted no such statute.

84.  Plaintiff  is  informed  and  believes  and  on  that  basis
alleges  that  the  COUNTRWIDE  DEFENDANTS  and  BANK  OF  AMERICA,
along  with  six  large  private  banking  institutions  operating
within  the  United  States  sued  as  DOES  1-6  (collectively  "the  Big
Six"),  agreed,  beginning  in  or  about  1994,  to  a  scheme  by  which
they  would  and  did  set  up  a  private  system  of  recording
interests  in  land  in  the  United  States,   that  would  give  them  a
competitive   advantage   over   smaller   banking   institutions,
effectively  fixing  prices  by  enabling  these  megabanks  to
transfer  mortgage  loans  quickly  into  securitized  pools  of  like
mortgages; this system became Defendant MERS.

85.  Plaintiff  is  further  informed  and  believes  and  on  that
basis  alleges  that  subsequent  to  the  creation  of  MERS,  the  Big

Six used their combined market power in the financial industry to take control of the market for private securitization of mortgages, to the virtual exclusion of smaller banking institutions, such that virtually all privately securitized mortgage loans are in trust to or serviced by the Big Six.

86.  Plaintiff is further informed and believes and on that basis alleges that subsequent to the creation of MERS, the Big Six were able to and did control the administration and servicing of virtually all private securitization of pooled mortgages and the capital they generated, such that other smaller banking institutions of the United States have been virtually "shut out" from private sources of capital for funding residential mortgage loans, unless they were willing to join into the MERS system, and sell the mortgages they originated into the mortgage pools set up and controlled by the Big Six, such that those institutions are denied the benefits of the interest generated by such mortgages and the income generated from servicing those mortgages.

87.  Plaintiff is further informed and believes and on that basis alleges that subsequent to the creation of MERS, smaller banking institutions in the United States have been forced out of the residential lending market, and instead were forced to engage in much more speculative forms of lending, such as

construction and development loans to builders, and small to medium sized commercial and industrial real estate loans.

88.  Plaintiff is further informed and believes and on that basis alleges that subsequent to the creation of MERS, the Big Six and MERS used their control over the residential mortgage market by inflating the market for residential properties in the United States and thereby increasing the proportionally based fees that such larger loans would generate.

89.  Such inflation manifested itself in a complete inversion of the order of mortgage loan creation and securitization.  The Big Six's desire for more profit led to a system in which a security instrument would be created and marketed to investors prior to any loan being originated.  The security would be tailored to consist of mortgages of certain specified sizes, features, and risk levels.  It would be only after the security was sold to investors with "place holder" and "bogus" assets that the Big Six would send out "orders" for mortgage loans that met the criteria set forth in the security's prospectus.

90.  The "orders" would then be transmitted to loan originators, whether they were units or subsidiaries the Big Six or independent brokers.  The originators would be "encouraged" to make loans of the type specified in the orders, since those loans were the ones most likely to be purchased and securitized.

91.   The originators would then be under pressure to make such loans to their customers, regardless of the customers' needs.   Given that the Big Six virtually controlled the market in loans, those originators would steer customers toward those loans, and either fail to mention or steer customers away from loans that might be otherwise more appropriate.

92.   Because larger loans generated larger fees, the originators would steer customers toward larger loans, whether or not such larger loans were within the customers' means or best interests.

93.   In order to facilitate the granting of larger loans, the Big Six developed loan products that did not depend on proof of a borrower's income, but rather depended on the value of the real property secured by the loans.

94.   In order to justify the granting of larger loans, pressure was brought to bear upon property appraisers: those who would not "hit the number" (appraise a property at a value that the lender wanted to lend) would not be given further business.

95.   As the result of the acts described above, the Big Six were able to increase the size of loans they made, bought, and securitized, allowing them to take their gains and redeploy them into even larger securities, and in the process were able to inflate the prices of residential real property to a point where they were far beyond the means of the purchasers to whom they

were readily giving loans, according to the lending standards they themselves had developed and used for decades.

96. Plaintiff is further informed and believes and on that basis alleges that the Big Six knew that such a business that depended upon ever increasing real estate values was unsustainable, and purposely created and used MERS to serve as a "firewall" between themselves, the loan originators, and the borrowers they were routinely pulling into unsustainable debt.

97. Plaintiff is further informed and believes and on that basis alleges that the Big Six also depended upon MERS to give them a quick and efficient way of rationalizing the interests they would need to secure interests in the real property, whether or not such rationalizations reflected the true relationship between lender and borrower, once their scheme of inflating prices reached its natural and inevitable point of saturation, real estate prices began to fall, and borrowers fell into financial distress.

98. Plaintiff is further informed and believes and on that basis alleges that the Big Six also created securities generally known as credit default swaps (CDSs), in which they took positions against the mortgage securities they created, in effect betting against the very home loan borrowers they had sought to entice into loans on constantly appreciating residential real property, knowing that those borrowers would

eventually be unable to meet those inflated obligations that the Big Six had endeavored to create.

99.  Plaintiff is further informed and believes and on that basis alleges, that COUNTRYWIDE FINANCIAL and COUNTRYWIDE HOME LOANS, INC., (a) knew of and acquiesced to the creation of MERS by the Big Six, and actively used MERS to facilitate the creation of its own mortgage loan securities, and (b) knew of the acts of the Big Six described above in inflating the mortgage market, and knowingly and willfully accepted the benefits of such an inflated market in the form of increased fees for servicing residential mortgage loans and residential mortgage securities.

100.  Plaintiff is further informed and believes and on that basis alleges that COUNTRYWIDE FINANCIAL and COUNTRYWIDE HOME LOANS, INC. agreed to include MERS as mortgagee and "nominee" for the Mortgage as part of an agreement between COUNTRYWIDE FINANCIAL and/or COUNTRYWIDE HOME LOANS, INC. as a "member" of MERS, MERS itself, and the Big Six, sued here as DOES 1-6, inclusive, to (a) protect and insulate COUNTRYWIDE FINANCIAL and COUNTRYWIDE HOME LOANS, INC. from otherwise valid claims and defenses by mortgagors and borrowers by providing an intermediary in the transaction; (b) provide a conduit for the securitization, and exclusive access to the business of servicing securitized mortgage loans and DOE Defendants 1-6; and

(c) eliminate competition in the real residential loan industry in that consumers are offered only loans that conform to the preset parameters of securitization pools, and cannot obtain loans that more closely fit their particular needs.

101. In July 2003 during a conference call with analysts, COUNTRWIDE'S MOZILLO announced the company's goal: "to dominate the purchase market and to get [COUNTRYWIDE'S] overall market share to the ultimate thirty percent by 2006-2007." COUNTRYWIDE originated $499 billion in mortgage loans in 2005, $468 billion in 2006, and $416 billion in 2007. By 2006, when the Plaintiff's loan was originated, COUNTRYWIDE's loans (as reflected in dollar value of originations) were 31.9% conforming conventional loans, 45.2% nonconforming conventional loans, 8.7% subprime, and 10.2% home equity.[15]

102. As the result of the conduct of the Defendants, Plaintiff has been damaged, in that he has been subject to the imposition of artificially high mortgage rates and fees for mortgage servicing, without any meaningful choice, and without any opportunity to bargain for more advantageous fees, such fees being added to any balance due to the mortgagee in the event of default, all inconsistent with a system of free and fair trade guaranteed to all persons, and the restraint of which is

---

[15] Countrywide 10-K reports: 2007, page 29; 2006 page 28; and 2005, page 24.

prohibited by the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2, and the Clayton Anti-Trust Act, 15 U.S.C. § 15 et seq.

103. Section 4 of the Clayton Antitrust Act, codified at 15 U.S.C. §15, provides as follows:

> [A]ny person who shall be injured in their business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fees.

104. Plaintiff alleges he is injured in his property, and is therefore entitled to bring an action against Defendants for Defendants' actions complained of above.

105. As a direct and proximate result of the unlawful conduct of the Defendants, and each of them, in monopolizing or attempting to monopolize the mortgage lending and servicing market, Plaintiff has suffered pecuniary damages in an amount to be determined, and subject to treble augmentation.

106. Plaintiff has also been required to retain legal counsel and therefore request that the Defendants be required to pay Plaintiff's attorney fees and costs necessary to pursue his legal and just claims, pursuant to 15 U.S.C. §15.

### CLAIM 2
### VIOLATIONS OF THE HAWAII ANTI-TRUST AND UNFAIR PRACTICES ACTS
**(Against COUNTRYWIDE FINANCIAL and COUNTRYWIDE HOME LOANS, INC., BANK OF AMERICA, N.A., and MERS)**

107. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

108. The conduct of Defendants  COUNTRYWIDE FINANCIAL, COUNTRYWIDE HOME LOANS, INC., BANK OF AMERICA, N.A., and MERS, and each of them, as described more fully above, violates HRS § 480-2 by using unfair methods of competition and unfair or deceptive acts or practices in the conduct of their trade or commerce. Plaintiff alleges Defendants' conduct is a violation of the Hawaii Monopolization Act, HRS § 480-9, being a monopoly or an attempt to monopolize.

109. Defendants' qualification of Plaintiff for a loan he could not afford, sale of said loan to Plaintiff, electronic registration of the Subject Mortgage, and other activities related to the origination and management of Plaintiff's mortgage loan, as described herein, were accomplished with the intent to destroy the competition in the mortgage lending industry in Hawaii in violation of HRS § 481 by undercutting the prices that competitors could offer due to these entities' market size, strength, and use of predatory lending practices, including use of inflated appraisals and adjustable-rate mortgages that effectively trapped unsophisticated borrowers (consumers) in loans from which they could not extricate themselves, unless they refinanced, which generated a second round of profits for Defendants.

110. Defendant COUNTRYWIDE HOME LOANS, INC. offered its loan product to Plaintiff at less than the cost thereof to said Defendant, in violation of HRS § 481-3. This "originate to sell" business model was used because said Defendant at no time intended to hold Plaintiff's loan in its portfolio, but intended to turn it into a different product for resale to investors by way of securitization, as described hereinabove. In sum, Defendant COUNTRYWIDE HOME LOANS qualified Plaintiff for a loan that violated its own underwriting criteria and sold Plaintiff's loan to him at a lower rate than that of competitors because said Defendants' control of the market ensured profits made in subsequent transactions with others.

111. Because the loan contract between Plaintiff and COUNTRYWIDE HOME LOANS, INC. violated the provisions of HRS § 481, said contract is illegal and Defendants can make no recovery thereon.

112. As a direct and proximate result of the unlawful conduct of Defendants COUNTRYWIDE FINANCIAL and COUNTRYWIDE HOME LOANS, INC., and MERS, and each of them, in monopolizing or attempting to monopolize the mortgage lending and servicing market, and in Plaintiff has suffered pecuniary damages in an amount to be determined at trial.

113. Plaintiff was required to retain legal counsel and, therefore, requests that Defendants, COUNTRYWIDE FINANCIAL and

COUNTRYWIDE HOME LOANS, INC., and MERS, and each of them, be

required to pay Plaintiffs' attorney fees and costs necessary to

pursue their legal and just claims, pursuant to Hawaii Revised

Statutes § 480-.

114. Further, pursuant to HRS § 480-13.5, Plaintiff was at

all times relevant an elder, being over 62 years of age, and is

entitled to the civil penalties for consumer frauds committed

against elders for violation of HRS § 480-2.

### CLAIM 3
### COMMON LAW FRAUD
### (Against COUNTRYWIDE HOME LOANS, INC. and BANK OF AMERICA)

115. The allegations contained in the preceding paragraphs

of this Complaint are incorporated herein by reference.

116. As set forth above, on or about April 13, 2006,

Defendant COUNTRYWIDE HOME LOANS, INC. made a loan secured by

the subject property to Plaintiff.

117. COUNTRYWIDE HOME LOANS had an institutionalized scheme

to defraud borrowers, including Plaintiff herein, by

misrepresenting or concealing the true terms of the loans

offered and by failing to affirmatively offer fixed-rate, fully

documented loans to borrowers, including Plaintiff. If

COUNRYWIDE had followed its own standard underwriting criteria

(and not by using a plethora of exceptions), Plaintiff would not

have qualified for the loan amount into which he was coerced.

118. Defendants' goal was to supply the secondary market with as many loans as possible, ideally those that would earn the highest premiums. COUNTRYWIDE expanded its share of the consumer market for mortgage loans through a variety of deceptive practices, undertaken with the direction, authorization, and ratification of its senior management, including DAVID SAMBOL and ANGELO R. MOZILLO.

119. The COUNTRYWIDE Defendants willfully violated their own underwriting standards and guidelines, which resulted in foreseeable harm to Plaintiff, and to borrowers similarly situated.

120. Prior to 2005, a substantial majority of the mortgage loans that COUNTRYWIDE originated each year were traditional, long-term, fixed-rate, first-lien and fully documented mortgage loans to prime borrowers. These "conforming loans" met the guidelines for sale to the government-sponsored entities Federal National Mortgage Association (Fannie Mae or FNMA) and the Federal Home Loan Mortgage Corporation (Freddie Mac), and were traditionally limited to mortgage loans no greater than $417,000 for a single-family residence. Conforming loans, if properly underwritten and serviced, historically were the most conservative loans in the residential mortgage industry with the lowest rates of delinquency and defaults. During 2001-2003, more than 50% of Countrywide's loans were conforming, resulting in

that entity's originating $124 billion, $252 billion, and $435 billion in loans in 2001-2003, respectively.

121. Mortgage loans that do not meet FNMA and Freddie Mac's guidelines are known as "nonconforming loans." COUNTRYWIDE's percentage increase in nonconforming loans rose significantly in 2005. However, COUNTRYWIDE continued to represent to borrowers and to investors in its mortgage-backed securities that its loans complied with the strict underwriting guidelines, when in fact they did not. Plaintiff relied on these representations when he made the decision to enter into the loan with COUNTRYWIDE. He was at no time warned that the company was setting him up for default, foreclosure, and possibly bankruptcy.

122. Despite its top-down focus on generating more loans to feed its securitization machines, COUNTRWIDE continued to portray itself to the public, and to Plaintiff herein, as a trustworthy company  that was characterized by high professional standards, offering loans that people could afford. For example, in a Fixed Income Investor Forum hosted by COUNTYWIDE in September 2006, MOZILLO affirmed the lender's responsible lending practices, stating "[A]s an industry leader we served as a role model to others in terms of responsible lending."

123. At no time did COUNTRYWIDE inform the Plaintiff that his loan was poor quality, that it did not meet the company's

underwriting standards, that it was considered sub-prime and/or
nonconforming. Plaintiff was induced to enter into the loan with
COUNTRYWIDE based in significant part upon its representations
of reliability and honesty. He believed that the company
reliably qualified him for the loan he was placed into.

124. Mortgage loan securitizations were vital to
COUNTRYWIDE's financial success. In order to originate more
loans, COUNTRYWIDE created, approved, and used riskier loan
products by implementing its looser stated underwriting
standards, and then went the extra mile by applying exceptions
to those weakened standards.

125. COUNTRYWIDE needed to engage in securitizing its loan
transactions so that it could remove the mortgage loan assets
and potential liabilities (including borrowers' default on the
toxic loans it was selling) from its balance sheet.

126. Defendant COUNTRYWIDE HOME LOANS, INC. represented to
Plaintiff that he would be able to refinance the subject loan
when he had built equity and established a favorable payment
history.

127. Plaintiff is informed and believes that because of
their participation in the scheme to control and stifle
competition in the residential mortgage loan industry described
herein, Defendant COUNTRYWIDE HOME LOANS, INC. knew or should
have known that no other lender would be willing to extend loans

on the Subject Property due to the Subject Property's high loan-to-value ratio at origination, the inflated appraisal obtained at the lender's direction, and that Plaintiff would be effectively "trapped" in the loan he had with Defendant COUNTRYWIDE HOME LOANS, INC.

128. Plaintiff relied upon the representations made to him by Defendant COUNTRYWIDE HOME LOANS, INC., and that those representations were a full and complete disclosure of Defendant's policies and practices with regard to making loans on the Subject Property.

129. As the result of Defendant COUNTRYWIDE HOME LOANS, INC.'s misrepresentation of material fact set forth above, Plaintiff is entitled to, and thus seek, rescission of the Mortgage.

130. As a further direct and proximate result of Defendant COUNTRYWIDE HOME LOANS, INC.'s misrepresentations of material fact set forth above, Plaintiff have been damaged in an amount to be established at trial.

131. Defendant COUNTRYWIDE HOME LOANS, INC.'s acts, as set forth above, were intentional, made with the intent to harm Plaintiff, and conducted in conscious disregard of Plaintiff's rights.  Such acts constitute malice, and warrant the award of exemplary damages in an amount to be established at trial.

132. Because BANK OF AMERICA, N.A., has merged with COUNTRYWIDE FINANCIAL, and acquired substantially all of the assets of COUNTRYWIDE HOME LOANS, it is the successor in liability to COUNTRYWIDE HOME LOANS and is jointly and severally or otherwise vicariously liable for the wrongful conduct, as alleged herein, of that Defendant.

## CLAIM 4
### UNFAIR AND DECEPTIVE ACTS OR PRACTICES
### (Against COUNTRYWIDE HOME LOANS, INC., and BANK OF AMERICA, N.A.)

133. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

134. Plaintiff are "consumers" as that term is defined in HRS § 480-1.

135. The described acts and practices of making and servicing mortgage loans involved "trade or commerce" as that term is used in HRS § 480-2(a).

136. An unfair or deceptive act or practice (UDAP) in the conduct of any trade or commerce is unlawful pursuant to HRS § 480-2(a).

137. Certain deceptive trade practices are also unlawful pursuant to HRS §481A-3.

138. In connection with the subject loan, COUNTRYWIDE HOME LOANS, INC. engaged in UDAPs that violate HRS § 480-2(a) and/or 481A-3, including but not limited to:

a.   Targeting financially unsophisticated and
     otherwise vulnerable consumers for inappropriate
     credit products;

b.   Failing to adequately disclose the true costs and
     risks of the subject loan and its/their
     inappropriateness for Plaintiff;

c.   Failing to disclose that lender approved the
     subject loan based on financial documents
     required by Defendants such as Plaintiffs' tax
     returns and pay stubs without regard to
     Plaintiffs ability to sustain the loan with any
     reasonable means test;

d.   Falsely representing or failing to fully and
     completely disclose the amounts Plaintiffs were
     required to pay;

e.   Making a defective mortgage loan or loans that
     resulted in little net economic benefit to
     Plaintiffs with the primary objective of
     generating fees;

139. Defendant COUNTRYWIDE HOME LOANS, INC.'s actions in
connection with the subject loans constitute UDAPs in violation
of HRS §§ 480-2(a), 481A-3, or both.

140. Defendant COUNTRYWIDE HOME LOANS, INC.'s conduct
caused Plaintiff to suffer injury to their property, including
without limitation wrongfully induced payment of money.

141. Defendant COUNTRYWIDE HOME LOANS, INC.'s above-
described acts and practices offend established public policy
and were immoral, unethical, oppressive, unscrupulous, and

substantially injurious to consumers and were, therefore, unfair in violation of HRS § 480-2(a).

142. Defendant COUNTRYWIDE HOME LOANS, INC.'s above-described acts and practices involved material representations, omissions or practices that were likely to mislead consumers acting reasonably under the circumstances and were, therefore, deceptive in violation of HRS §§ 480-2(a), 481A-3, or both of them.

143. Pursuant to HRS § 480-12, a contract or agreement in violation of HRS Chapter 480 is void and is not enforceable at law or in equity.  Plaintiffs thus seek rescission of the loan contract.

144. In the alternative, as a direct and proximate result of one or more of the foregoing acts and/or omissions of Defendant COUNTRYWIDE HOME LOANS, INC., Plaintiffs have been damaged in an amount to be established at trial.

145. Plaintiff have also been required to retain legal counsel and, therefore, request that the Defendant be required to pay Plaintiffs' attorney fees and costs necessary to pursue their legal and just claims, pursuant to Hawaii Revised Statutes § 480-9.

146. Because BANK OF AMERICA, N.A., has merged with COUNTRYWIDE FINANCIAL, and acquired substantially all of the assets of COUNTRYWIDE HOME LOANS, it is the successor in

liability to COUNTRYWIDE HOME LOANS and is jointly and severally or otherwise vicariously liable for the wrongful conduct, as alleged herein, of that Defendant.

### CLAIM 5
### BREACH OF FIDUCIARY DUTY
### (Against COUNTRYWIDE HOME LOANS, INC., MERS, and BANK OF AMERICA, N.A.)

147. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

148. Defendant COUNTRYWIDE HOME LOANS, INC., by contracting to, and representing it would provide mortgage loan services and a loan to Plaintiff which he understood was not only meant to be best suited to his needs given his income and expenses but also would allow him to satisfy their obligations without risk of losing their property, was a "fiduciary" in which Plaintiff reposed trust and confidence, especially given that he was not an investment banker, securities dealer, mortgage lender, mortgage broker, or mortgage lender.

149. Defendant MERS, in agreeing to serve as mortgagee in the Mortgage transaction, also was likewise a fiduciary, in whom Plaintiff placed similar trust and confidence as he did in Defendant COUNTRYWIDE HOME LOANS, INC.

150. COUNTRYWIDE HOME LOANS, INC. breached its fiduciary duties to Plaintiff by fraudulently inducing him to enter into a mortgage transaction which was contrary to his stated intentions

and interests, and by making a false representation as to its interest in the Subject Property to benefit its own interests at Plaintiff's expense.

151. Plaintiff upon information and belief, and on that basis allege that Defendant MERS was aware of COUNTRYWIDE HOME LOANS, INC.'s breaches of fiduciary duties described above, did nothing to prevent them, and has done nothing to correct them, such actions in themselves being a further breach of fiduciary duty owed to Plaintiffs.

152. Plaintiff upon information and belief, and on that basis allege that Defendant COUNTRYWIDE HOME LOANS, INC. breached its fiduciary duties to Plaintiff by taking positions in the highly leveraged futures or options market, such interests were in direct opposition to Plaintiff's interests and the general housing market as a whole.

153. As a direct and proximate result of COUNTRYWIDE HOME LOANS, INC. and MERS' breaches of fiduciary duties, Plaintiff is entitled to rescission of the transaction, and damages in an amount to be established at trial.

154. Under the totality of the circumstances, the actions of Defendants COUNTRYWIDE FINANCIAL and COUNTRYWIDE HOME LOANS, INC. and MERS were willful, wanton, intentional, and undertaken with the conscious disregard for the Plaintiffs' rights.  Such actions warrant an award of exemplary damages to both punish and

make an example of Defendants as to other persons or entities with similar inclinations.

155. Because BANK OF AMERICA, N.A., has merged with COUNTRYWIDE FINANCIAL, and acquired substantially all of the assets of COUNTRYWIDE HOME LOANS, it is the successor in liability to COUNTRYWIDE HOME LOANS and is jointly and severally or otherwise vicariously liable for the wrongful conduct, as alleged herein, of that Defendant.

**CLAIM 6**
**UNJUST ENRICHMENT**
**(Against Defendant COUNTRYWIDE HOME LOANS, INC., BANK OF AMERICA, N.A.)**

156. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

157. COUNTRYWIDE HOME LOANS, INC. had an implied contract and warranty with Plaintiff to ensure that HE understood all fees, rates, payments and charges which would be paid to COUNTRYWIDE HOME LOANS, INC. or its successors in interest, to obtain credit on Plaintiff's behalf, to not charge any fees which are not related to the settlement of the loan, and to disclose to Plaintiffs that the loan products together would provide a mortgage designed specifically with Plaintiff's known personal financial information required by COUNTRYWIDE HOME LOANS, INC..

158. COUNTRYWIDE HOME LOANS, INC., failed and refused, and continues to fail and refuse to honor the warranties set forth above.

159. COUNTRYWIDE HOME LOANS, INC. cannot, in good conscience and equity, retain the benefits from its actions of charging a higher interest rate, fees, rebates, kickbacks, profits and gains from any resale of mortgages and notes using Plaintiff's identity, credit score, income, appraisal and reputation without consent, right, justification or excuse as part of an illegal enterprise scheme.

160. Defendant COUNTRYWIDE HOME LOANS, INC. has been unjustly enriched at the expense of Plaintiff and maintenance of the enrichment would be contrary to the rules and principles of equity.  Plaintiff thus demands restitution from Defendant COUNTRYWIDE HOME LOANS, INC. in the form of actual damages to be proven at the trial on this matter.

161. Because BANK OF AMERICA, N.A., has merged with COUNTRYWIDE FINANCIAL, and acquired substantially all of the assets of COUNTRYWIDE HOME LOANS, it is the successor in liability to COUNTRYWIDE HOME LOANS and is jointly and severally or otherwise vicariously liable for the wrongful conduct, as alleged herein, of that Defendant.

### CLAIM 7
### SLANDER OF TITLE

**(Against COUNTRYWIDE HOME LOANS, INC., BANK OF AMERICA, N.A., MERS and THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2006-23CB, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-23CB)**

162. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

163. Historically, a note and mortgage generally were inseparable. Every time a loan secured by a mortgage was sold, the assignee was required to record the assignment to protect its security interest. The MERS system caused this traditional system to be radically altered. While the promissory notes may be transferred many times between multiple MERS members, the mortgage remains held by MERS as "mortgagee of record." The very operation of the MERS system results in the promissory note and mortgage being split. Plaintiffs submit that MERS is not a party to the Promissory Note underlying the Mortgage and has no authority to take any action with respect to the Note. See Exhibit 2.

164. On or about August 27, 2009, Defendant MERS caused to be recorded in the State of Hawaii Bureau of Conveyances a document called an "Assignment," which purports to transfer the Mortgage from MERS, as nominee for COUNTRYWIDE HOME LOANS, INC., to THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST

2006-23CB, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-23CB. Said document was recorded as document number 2009-131920. Said Assignment purports to assign the underlying Promissory Note as well. Exhibit 3.

165. Plaintiff submits that the Mortgage, because it has become separated from the promissory note it secures either upon the Mortgage's entry into the MERS system, or thereafter, has become unenforceable.

166. Plaintiffs submit that the Mortgage does not grant legal authority to MERS to MERS to assign a valid and enforceable interest in the Subject Mortgage; therefore, the MERS assignment is fraudulent and/or void.

167. Plaintiff further submit that because MERS does not have legal authority to assign the Mortgage and/or Note that THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2006-23CB, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-23CB is not a bona fide holder of a valid security interest in the Property, and its Notice of Intent to Foreclose, recorded as Document No. 2009-9131921 in the State of Hawaii Bureau of Conveyances, is void. Exhibit 4.

168. The recording of the Assignment by MERS, as nominee for COUNTRYWIDE HOME LOANS, INC., and the recording of the Notice by THE BANK OF NEW YORK MELLON directly impairs the

vendibility of the property on the open market in an amount to be determined at trial.

169. The recording of the documents made it necessary for Plaintiff to retain legal counsel and bring this action to cancel the instrument, casting doubt on Plaintiffs' title. Therefore, Plaintiffs are entitled to attorney's fees and costs incurred in cancelling the instruments.  The exact amount of such damages is not known to Plaintiff at this time, and Plaintiff will move to amend this Complaint to state such amount when the same becomes known.

170. The aforementioned record was motivated by fraud and malice, in that Defendants COUNTRYWIDE HOME LOANS, INC. and MERS knew or should have known that the assignment was false, because MERS has no authority to assign the Mortgage.  Such action warrants an award of exemplary damages in an amount to be determined at time of trial.

171. Because BANK OF AMERICA, N.A., has merged with COUNTRYWIDE FINANCIAL, and acquired substantially all of the assets of COUNTRYWIDE HOME LOANS, it is the successor in liability to COUNTRYWIDE HOME LOANS and is jointly and severally or otherwise vicariously liable for the wrongful conduct, as alleged herein, of that Defendant.

## CLAIM 8
## QUIET TITLE

**(Against COUNTRYWIDE HOME LOANS, INC., BANK OF AMERICA, N.A.,
MERS and THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK,
TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN
TRUST 2006-23CB, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES
2006-23CB)**

172. Plaintiff incorporates all of the preceding paragraphs of this complaint as if set forth in full here.

173. At the time the loan closed on April 13, 2006, the Note gave COUNTRYWIDE, then the Lender and originator, the right to payments. The terms of the Note state that the only one who takes the Note by transfer, and who is entitled to receive payments is the Note Holder.

174. Plaintiff has a Warranty Deed on the Property, and has a claim to the Property superior to all others.

175. Trust law generally requires strict compliance with trust documents, including the PSA.  Failure to comply strictly with the time requirements of the PSA with respect to the transfer of the note and security instrument means that the transfer is void and the Trust does not have good title to Plaintiff's Mortgage.

176. Section 2.01(a) and (c) of the PSA governing the Trust into which Plaintiff's Promissory Note was purportedly entered, represents and warrants that:

> (a) … On or prior to the Closing Date [i.e., June 28, 2006] Countrywide shall deliver to [CWALT, Inc. as the Depositor] or, at the Depositor's direction, to the Trustee or other designee of the Depositor, the Mortgage File [i.e., the mortgage documents listed in

Section 2.01] for each Mortgage Loan listed in the Mortgage Loan Schedule … .

(c) [CWALT, INC. as Depositor] has delivered or caused to be delivered to the Trustee … for the benefit of the Certificateholders, the documents and instruments with respect to each Mortgage Loan as assigned: (i)(A) the original Mortgage Note … or (B) with respect to any Lost Mortgage Note, a lost note affidavit from Countrywide stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note.

[To clarify terminology as used within the PSA: The term "mortgage" means deed of trust or other instrument creating a first lien on an estate in fee simple or leasehold interest in real property securing a Mortgage Note.

"Mortgage Note" is defined as follows: The original executed note or other evidence of indebtedness evidencing the indebtedness of a Mortgagor under a Mortgage Loan. It is also known as "promissory note," and is referred to by both names, as applicable, herein.] PSA, at Definitions.[16]

177. The PSA at Section 2.01 further represents and warrants in relation to the assignment of a MERS Mortgage Loan that:

[COUNTRYWIDE, as Seller] agrees that it will cause, at the Trustee's expense, the MERS(R) System to indicate that the Mortgage Loans sold by such Seller to the Depositor have been assigned by that Seller to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement) in such computer files the information required by the MERS(R) System to identify the series of the Certificates issued in connection with such Mortgage Loans.

---

[16] Id., Footnote 2.

178. In other words, on or before the Closing Date (June 28, 2006), the original mortgage note must have been delivered or caused to be delivered to the Trustee and COUNTRYWIDE must provide written confirmation to the Trustee evidencing the assignment of the Mortgage.

179. Plaintiff submits that neither the Note nor the Mortgage was entered into the Trust in accordance with the terms and conditions of the PSA. Plaintiff further alleges that the original Note never left the possession of Countrywide. It is the admitted practice of Countrywide to maintain possession of the original Notes. There is no evidence that a lost note affidavit was entered into Trust by the Closing Date. In the absence of evidence to the contrary, Plaintiff alleges that neither the Note nor a valid lost note affidavit was deposited into the Trust prior to the Closing Date.

180. With respect to the assignment of Plaintiff's Mortgage, the evidence clearly indicates that the Mortgage was not assigned to the BANK OF NEW YORK until July 30, 2009; approximately **three years after the Closing Date of the Trust.** Plaintiff submits that such retroactive assignment of the Mortgage is not permitted under the terms of the PSA, which makes clear that evidence of assignment must be provided, in written form, **no later than 30 days after the Closing Date (June 28, 2006).** Exhibit 1 at 2.01(c).

181. After default, numerous parties have come forward, attempting to demonstrate an entitlement to the Property or entitlement to foreclose, through a claimed interest as nominee, agent, purported Note Holder, or other undeclared, unspecified interest.

182. As fully detailed hereinabove, those parties claiming interest are the Defendants identified in this claim. The defective and void nature of these entities' claims to the Property has been set forth. Each Defendant has actual knowledge of the defects in the recorded chain of title and in the purported transfer(s) of the Note. Each Defendant has contributed to the cloud currently existing on title to the Property.

183. Plaintiff has been given conflicting information about the holder of the Note. Upon information and belief, the Note originally was held by COUNTRYWIDE and Plaintiff is unaware of any valid transfer of said Note.

184. BANK OF NEW YORK MELLON purports to be the party entitled to enforce the Note through foreclosure. However, Plaintiff has no knowledge of, and no way to determine outside discovery in this lawsuit, who is the legal Note Holder, who is entitled to payment, if anyone, whether the Note still exists, and whether it has been paid by federal insurance or other means.

185. Plaintiff is in jeopardy, because the true Holder of the Note as well as third parties could come forward claiming an unsatisfied interest in the Note, and may or may note be subject to Plaintiff's various affirmative defenses and counterclaims. Plaintiff is entitled to proof of the true holder of the Note to avoid this imminent danger.

186. As to the Mortgage which secures the Note, at the time that the Mortgage was recorded in the name of MERS, the Mortgage and Note became separated, with the Note being retained by COUNTRYWIDE. Plaintiff believes that the Mortgage and Note have remained separated ever since.

187. The Assignment of Mortgage, absent a legal transfer of the underlying debt (Note), transfers nothing. As detailed hereinabove, MERS' Assignment of Mortgage is not a valid transfer of the Mortgage or Note.

188. Various Defendants have filed documents in the Hawaii Bureau of Conveyances against the Property, without the legal authority to do so. Those documents include, but are not limited to the Assignment of Mortgage and the Notice of Foreclosure Under Power of Sale.

189. Further, upon information and belief, through payments from Plaintiff, insurance coverage, or other methods, any party with a valid claim to payment under the Note may have already been paid.

190. Plaintiff is entitled to an order from this Court that the Plaintiff's estate in the Property is established to him, that title be quieted in his name, that all illegally recorded documents be declared null and void with filings at the Hawaii Bureau of Conveyances to that effect, and that all Defendants be barred and estopped from having or claiming any right or title to the Property, adverse to the Plaintiff's, and that the Mortgage be released by a recording at the Hawaii Bureau of Conveyances.

**CLAIM 9**
**INJUNCTIVE RELIEF**
**(Against Defendant THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2006-23CB, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-23CB)**

191. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

192. Plaintiff upon information and belief that Defendant THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2006-23CB, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-23CB intends to conduct a non-judicial foreclosure sale of the Subject Property.

193. Plaintiff has alleged facts that demonstrate a likelihood that Plaintiff will succeed on the merits of his claims set forth in this Complaint.

194. Plaintiff further alleges that should Defendant THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2006-23CB, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-23CB follow through with its stated intention to foreclose upon the Subject Property, that he will suffer irreparable harm, including, but not limited to loss of his rights to rescind the loan transaction, loss of the use of the Subject Property, and loss of his right to exclude others from entering, making use of, or removing things of value from the Subject Property.

195. Plaintiff further alleges that the balance of hardships between Defendant THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2006-23CB, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-23CB and them falls firmly and unequivocally in the Trust's favor, in that Plaintiff depends on the Subject Property as his home, while Defendant THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2006-23CB, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-23CB is a large business organization with ample assets upon which to depend, and no interest in the Subject Property beyond selling it to a third party.

196. Plaintiff, therefore, seeks an order from the Court enjoining Defendant THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2006-23CB, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-23CB from conducting the sale of the Subject Property pursuant to any alleged power of sale, pending the resolution of this action, whether by judgment of the Court or mutually agreed settlement made between all parties to this action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands Judgment against Defendants, as follows:

a. For an order enjoining Defendant THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2006-23CB, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-23CB from foreclosing upon the Subject Property pursuant to any alleged power of sale, pending the resolution of this action, whether by judgment of the Court or mutually agreed settlement made between all of the parties to this action;

b. Awarding compensatory and/or rescissionary damages in favor of Plaintiff and against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding statutory damages in such amounts as shall be established at the time of trial;

d. Awarding punitive or exemplary damages to Plaintiff for the common-law fraud claim;

e.   Awarding Plaintiff his reasonable costs and expenses
     incurred in this action, including attorney's fees and
     expert fees; and

f.   For such other relief as the Court deems just and
     equitable.

### DEMAND FOR JURY TRIAL

Plaintiff CHESTER A.K. DILLEY, INDIVIDUALLY AND AS TRUSTEE

OF THE CHESTER DILLEY SR. REVOCABLE TRUST DATED OCTOBER 14,

1993, hereby demands trial by jury on all issues triable by

right to a jury.

Dated March 8, 2011, at Wailuku, Hawaii.


                         IVEY FOSBINDER FOSBINDER LLLC
                         A LIMITED LIABILITY LAW COMPANY


                         _____
                         JAMES H. FOSBINDER
                         *Attorney for Plaintiff*